# Exhibit 1



**THE CITY OF BOSTON FINANCE COMMISSION**
43 Hawkins Street, Suite A111 • Boston, Massachusetts 02114
*p:* 617.635.2202 • *f:* 617.635.2206



February 29, 2016

### Community Centers Investigation

The Boston Finance Commission has reviewed City of Boston community center properties that are managed by outside vendors. The Commission has uncovered concerns regarding the processes used to secure vendors, the lack of current legal documentation to provide services, safety assurances for community center users and the lack of annual audits for the outside vendors that are providing services.

### Boston Centers for Youth and Families

Originally called Boston Community Schools, Boston Centers for Youth and Families (BCYF) was founded in 1972 due to an increase in new school buildings and the desire for community members to utilize the properties when school was not in session.  In 2001, the department was renamed Boston Centers for Youth and Families and currently has the mission statement: "To enhance the quality of life for Boston residents by partnering with community center councils, agencies and businesses to support children, youth, individuals and families. BCYF accomplishes its mission through a wide range of comprehensive programs and services according to neighborhood needs." There are a total of twenty-nine community center sites:  fifteen community centers sited in Boston Public School buildings, twenty community centers in BCYF owned buildings and four sites owned by the City of Boston, but used by outside groups.  The total fiscal year 2015 appropriated operating budget for the department was $24,521,774.

### Initial Investigation

The Boston Finance Commission initially began a review of expenses at community center facilities. Several expenses for repairs to a heating system and to a structure referred to as the Stillman Tennis Center resulted in additional questions.  An initial search of the Boston Center for Youth and Families web site did not list the site as being a City of Boston property, however, expenditures in the BCYF budget indicated that the city was incurring costs such as erecting and removing the structure, gas, electricity and some repairs to the structure. Boston Finance Commission staff members made several site visits and found that the structure is indeed owned by the City of Boston but was being managed by a group called Charlestown Against Drugs (CHAD). The Boston Finance Commission interviewed CHAD personnel and City of Boston employees from BCYF to gain

insight into the arrangement and operation. Finance Commission staff then contacted the main office of BCYF and requested to review the contract with CHAD. The Boston Finance Commission was then informed by BCYF that were was no formal agreement between CHAD and BCFY governing CHAD's operation of the facility. When Boston Finance Commission staff members became aware of the lack of a formal agreement between CHAD and BCYF, we began a more comprehensive review of all four BCYF sites owned by the City of Boston that are used by outside groups.  The sites that meet this criteria are:

1.  Orchard Gardens, 2 Dearborn St, Roxbury, operated by the Boys and Girls Clubs of Boston

2.  Stillman Tennis Bubble, 255R Medford St, Charlestown, operated by Charlestown Against Drugs

3.  Thomas Johnson, 68 Annunciation Rd, Roxbury, operated by Smart from the Start

4.  Walsh Center, 525R East Broadway, South Boston, operated by the Gavin Foundation

The Finance Commission requested contracts for the four above mentioned properties and was informed by BCYF personnel that there were no contracts in their files.  After a site visit to Orchard Gardens, an individual at this facility stated that the Boys and Girls Clubs had signed a 25 year lease with the City of Boston. BCYF personnel were able to locate a copy of a document which had the dates of operation manually altered and without initialed changes. Also, the document lacked dates next to signatures of several previous City of Boston officials. The authenticity of this document has not been verified. Subsequently, the Boston Finance Commission contacted the offices of the Boston City Council to confirm that the contract had been approved by a vote of the Council, a mandatory practice for this type of agreement, and found that there was no record of a BCYF contract with the Boys and Girls Club for the Orchard Gardens facility. In addition, we cannot verify that this was ever an agenda item at either the Boston City Council or the Office of the City Clerk. The Boston Finance Commission has requested that City of Boston officials locate and verify the document with original signatures.

## The Stillman Tennis Center

The Stillman Tennis Center is part of the Charlestown High School athletic fields and was originally constructed as three, open-air courts for use by the High School. To enable the High School and community members of Charlestown to utilize the courts year-round, a portable structure was purchased by the City of Boston which is erected in late October and removed in mid-May.  The structure, referred to as a "bubble" due to its appearance and structure, maintains its form through a generator that heats the structure and provides air pressure to keep the structure "inflated". The Center is currently being operated by Charlestown Against Drugs (CHAD) which provides community programming and operates as a membership/fee tennis center.

## Document Review

The Boston Finance Commission requested documentation from BCYF regarding the management of the Stillman Tennis Center and all costs associated with its operation.  After self-managing the operations in prior years, the Boston Centers for Youth and Families issued a Request for Proposals

(RFP) for three year operation of the Stillman Tennis Bubble on June 28, 2010. There were three respondents: Tenacity, Friends of Charlestown Tennis and Charlestown Against Drugs. Though the RFP stated that all responses had to be submitted by noon on July 19, 2010, emails and other paperwork demonstrate that this date was not met, due to the late release of the RFP. The Boston Finance Commission found submission evaluation forms completed by City of Boston employees, however, there was no paperwork indicating a vendor was selected to manage the operation and, as noted, there is no evidence that a contract was executed. The Finance Commission was able to locate an article dated February 21, 2011 that stated that Charlestown Against Drugs (CHAD) had taken over management of the Stillman Tennis Bubble in December of 2010 and had renamed the Center as the CHAD Tennis Club.

A review of the RFP indicates that the vendor has not been held to the "Responsibilities of the Successful Proposer" terms of the document as well. Section 14 of the document states that "The City requires the Proposer to pay the cost of all utilities. The Proposer shall provide, procure and maintain at its own cost and expense and without reimbursement, adequate and necessary heat, hot water, electricity, gas, and water and sewer facilities necessary for the proper maintenance and operation of the Property". When the facility was operated by the City of Boston, the City connected the "bubble" to the utilities at Charlestown High School. No separate meter was established after CHAD took over management of the facility, so the City of Boston has been paying the utilities ever since. We found that the vendor did not meet that contract requirement outlined in Section 14.

Additionally, the document states that the successful proposer shall be responsible for "Hiring a qualified vendor to assemble the Tennis Bubble structure on or before October 31st of each year and disassembling it and properly storing it no later than May 31st of the following year". Instead, the City of Boston has assumed those responsibilities by contracting and paying for these services each year, for a total annual cost of over $20,000 which includes:

Costs related to structure installation/removal

1. $15,000 yearly to put up/remove the structure.

2. $3,000 yearly for forklifts and drivers.

3. $1,500 yearly for generator start-up/close-down

4. $1,000 yearly for electrical work related to set up/take down of structure.

The City of Boston also paid for recent repairs including $8,700 for lighting and welding repairs in February of 2015 and $9,200 for the generator's back-up motor replacement in November of 2015. According to a BCYF document, with the exception of damage repaired under a vendor contract, other costs such as snow plowing and removal, day to day repairs are completed by BCYF facilities

and/or CHAD staff. The city also stores the structure in containers on Charlestown High School athletic fields.

It is important to note that Charlestown Against Drugs fully cooperated by providing information regarding their services and their financials.

### The Purpose of Outsourcing

The City of Boston has presumably considered entering into agreements with vendors as a method of eliminating expenses, while still offering access and programs to residents. This does not appear to have happened in these cases. Not only has the City of Boston assumed a large portion of the operating costs for the Stillman Tennis Center, but according to City Employees who are knowledgeable about the history of the Orchard Gardens facility, when the Boys and Girls Club took over the management, all of the City of Boston employees who had been working at Orchard Gardens were transferred to other city-managed community centers. There does not appear to have been any salary savings as a result. Additionally, Boston Finance Commission review found that many utilities, building repairs and maintenance at Orchard Gardens continued to be paid for by the taxpayers of the City of Boston which brings into question any financial benefits.

### Additional Concerns

Criminal Offender Record Information (CORI) is a record of an individual's criminal history in Massachusetts. The website for the Massachusetts Department of Criminal Justice Information Services, a member of the Executive Office of Public Safety and Security, states that organizations with programs for children under 18, should have their employees and volunteers CORI checked at a level of access of "required 2". This level requires that employees and volunteers would be checked for all adult and youthful offender convictions, non-convictions and pending offenses. The BCYF volunteer application states that all volunteers are subject to a CORI or SORI (Sex Offender Registry Information). Since the vendors have been operating in the BCYF facilities without contracts, there is currently no information as to whether the parties managing the facilities have required their employees and/or volunteers to undergo these background checks.

At least one of the Request for Proposals that was issued for management of the BCYF properties mentions a requirement for the vendor to acquire, at their expense, liability, property damage and worker's compensation insurance that names the City of Boston and BCYF as additionally insured under the policy. The language of the RFP states that this insurance needs to be maintained for each year of the contract, however, since all four of these contracts have lapsed or were never executed, it is unclear as to whether there are currently insurance policies in place. The Finance Commission inquired about the current status of insurance policies but members of BCYF were unsure whether these policies were current.

## Recommendations

1. The Finance Commission strongly urges that the primary focus be placed on assuring the safety of the children utilizing these four centers and as such, that the city immediately assure that all employees, volunteers and vendors who interact with the community center users, have up-to-date C.O.R.I. Checks.
2. The city should assess the long and short term needs of the communities and decide whether it is in the best interest of the taxpayers to continue leasing these properties or to reclaim the properties and convert them back into BCYF operated community centers. Priority should be placed on the needs of the communities.
3. Should the city decide it is in the best interest of the taxpayers to outsource the building(s) operations, the Finance Commission strongly urges that Request for Proposals be issued that require all utilities and non-structural repairs to be paid by the vendors. The goal of the RFP should be to focus on maximizing the benefits to the communities they serve while mitigating expenses. Once a vendor is chosen a contract of no longer than three years, with three year options, should be executed.
4. In some cases there appears to be revenues generated from the entities operating in the BCYF buildings.  The Finance Commission recommends that a five year "look back" at these revenues and the expenses paid by the city to maintain these buildings and operations, be undertaken.  Should the city decide to allow these operations to continue, yearly reports should be required from each vendor that details any income they derive from the operation of the center and the services they provided to the community. There should also be a yearly outside audit conducted by BCYF at the expense of the vendor.
5. Boston Centers for Youth and Families need to organize their files and assure that all public documents are filed in a professional manner for future access and verification purposes. The Finance Commission recommends that the city review all existing documentation regarding its community centers and begin the process of converting those and any other records into electronic versions. This process should include creating a system that will remind BCYF six months before contracts are due to expire and that RFPs or updated contracts must be executed.
6. The Stillman Bubble is beginning to show signs of wear and decisions will need to be made soon as to whether to remove the structure completely or replace it. The recent announcement regarding the Everett Casino agreement with the City of Boston included an announcement that Boston will dedicate some of the funding to the community of Charlestown. This should begin conversations between the City of Boston, BCYF and the Charlestown Community as to the future of the Stillman Tennis Center.

## Conclusions

The City of Boston has changed considerably since 1972, but the need for building community and creating a safe harbor for children remains. The history and origin of the Boston Centers for Youth

and Families show the desire for the citizens of Boston to connect with one another and to utilize the buildings of the city to enable this goal.  Due to years of personnel changes at BCYF, our investigation found that it is difficult to fully uncover how four City of Boston owned community center buildings became inhabited by vendors without executed contracts. Boston Finance Commission members were especially concerned that taxpayers continued to bear the costs of operating these facilities, while financial gain benefited outside vendors. The city must now make decisions for the future of the facilities that benefit the taxpayers of the city by improving operations of outside contracts at BCYF facilities.  The announcement that Mayor Walsh recently named William Morales as the new Commissioner of Boston Center for Youth and Families, offers an opportunity for the department to review their priorities and address the issues outlined in this report.

The Boston Finance Commission urges a swift response to these concerns.

Very Truly Yours,

Matthew A. Cahill
Executive Director
City of Boston Finance Commission

# Exhibit 2



**CITY OF BOSTON**
**MARTIN J. WALSH, MAYOR**
WILLIAM MORALES, COMMISSIONER

BCYF Blackstone
BCYF Charlestown
BCYF Cleveland
BCYF Clougherty Pool
BCYF Condon
BCYF Curley
BCYF Curtis Hall
BCYF Draper Pool
BCYF Flaherty Pool
BCYF Gallivan
BCYF Golden Age
BCYF Grove Hall
BCYF Hennigan
BCYF Holland
BCYF Hyde Park
BCYF Jackson/Mann
BCYF Leahy-Holloran
BCYF Madison Park
BCYF Mason Pool
BCYF Menino
BCYF Mildred Avenue
BCYF Mirabella Pool
BCYF Nazzaro
BCYF Ohrenberger
BCYF Paris Street
BCYF Paris Street Pool
BCYF Perkins
BCYF Pino
BCYF Quincy
BCYF Roche
BCYF Roslindale
BCYF Shelburne
BCYF Tobin
BCYF Tynan
BCYF Vine Street

*Administrative Offices*
*1483 Tremont Street*
*Boston, MA 02120*
*Phone: 617-635-4920*
*Fax: 617-635-4524*
*cityofboston.gov/bcyf*
*Facebook: BCYFBoston*
*Twitter: BCYFCenters*

*Every Neighborhood,*
*One Mission*

February 23, 2017

Mattapan Community Centers, Inc.
c/o Mr. Willie Veal
Board President
852 Blue Hill Ave.
Mattapan, MA 02126

Dear Mr. Veal,

I am writing to provide written notice that the Boston Centers for Youth & Families ("BCYF") has decided to disassociate itself from your non-profit organization, Mattapan Community Centers, Inc. BCYF will no longer be partnering with your organization, which previously served as a site council and 501(c)(3) partner for the BCYF Mildred Avenue Community Center and BCYF Gallivan Community Center.

BCYF made this decision after it was brought to our attention that your non-profit organization voted to authorize a loan to a relative of yours, Ms. Leah Veal Green. This vote occurred at a meeting held on October 21, 2015. The vote authorized the grant of funds for a loan to Ms. Veal Green to be held as a first mortgage on a property. The meeting minutes state that the loan was presented as a fundraising opportunity that would allow the money raised from repayment of the loan to be used for increased programming and other benefits for the Centers.

One of the primary legal responsibilities of a non-profit organization is to ensure that it complies with all applicable fiduciary duties, including the duty of care and duty of loyalty. Inherent in these legal responsibilities is the obligation to ensure that charitable assets are not used inappropriately or diverted to private interests. See M.G.L. c. 12, § 8. Another inherent responsibility is to ensure that adequate procedures are in place to prevent impermissible conflicts of interest, such as a board member using his or her position to further the interests of anyone else, including his or her own interests and those of family members.

By authorizing a loan to your relative, it appears that your organization failed to meet these primary legal responsibilities. In addition to the apparent illegality of the use of charitable assets to advance private interests, the fact that the loan was presented as a fundraising opportunity to the Board of Directors without any documentation in the minutes that any disclosure was given regarding your relationship to the individual who would benefit from the mortgage suggests that the vote likely violated your organization's bylaws. BCYF was also provided with information that this vote and transaction was not disclosed to your accountant, Thomas Bowe, or to your bookkeeper, Bonnie Wallace, and it was not fully disclosed to all important stakeholders in the organization.



**CITY OF BOSTON**
**MARTIN J. WALSH, MAYOR**
WILLIAM MORALES, COMMISSIONER

BCYF Blackstone
BCYF Charlestown
BCYF Cleveland
BCYF Clougherty Pool
BCYF Condon
BCYF Curley
BCYF Curtis Hall
BCYF Draper Pool
BCYF Flaherty Pool
BCYF Gallivan
BCYF Golden Age
BCYF Grove Hall
BCYF Hennigan
BCYF Holland
BCYF Hyde Park
BCYF Jackson/Mann
BCYF Leahy-Holloran
BCYF Madison Park
BCYF Mason Pool
BCYF Menino
BCYF Mildred Avenue
BCYF Mirabella Pool
BCYF Nazzaro
BCYF Ohrenberger
BCYF Paris Street
BCYF Paris Street Pool
BCYF Perkins
BCYF Pino
BCYF Quincy
BCYF Roche
BCYF Roslindale
BCYF Shelburne
BCYF Tobin
BCYF Tynan
BCYF Vine Street

*Administrative Offices
1483 Tremont Street
Boston, MA 02120
Phone: 617-635-4920
Fax: 617-635-4524
cityofboston.gov/bcyf
Facebook: BCYFBoston
Twitter: BCYF-Centers*

*Every Neighborhood,
One Mission*

BCYF expects the site councils that we partner with to follow all applicable state, federal and local laws. We cannot continue to associate ourselves with an organization that makes financial decisions like the one discussed in this letter.  This type of behavior is unacceptable and BCYF does not condone it.

Sincerely,

William Morales
Commissioner

# Exhibit 3



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
**ATTORNEY GENERAL**

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

**MATTAPAN COMMUNITY CENTERS, INC.**
c/o William Veal
5 Mildred Avenue
Mattapan, MA 02126-

## Certificate for Solicitation

This certificate has been issued to the organization listed below because it is current in its filings with the Attorney General's Division of Non-Profit Organizations/Public Charities. This registration in no manner constitutes endorsement or approval by the Commonwealth of Massachusetts of the named organization.

Name of organization:                    MATTAPAN COMMUNITY CENTERS, INC.

Certificate End Date:                     11/15/2019

Attorney General's Account Number:   035182

Issued By
  The Division of Non-Profit Organizations/Public Charities



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

MATTAPAN COMMUNITY CENTERS, INC.
c/o William Veal
5 Mildred Avenue
Mattapan, MA 02126-

## Certificate for Solicitation

This certificate has been issued to the organization listed below because it is current in its filings with the Attorney General's Division of Non-Profit Organizations/Public Charities. This registration in no manner constitutes endorsement or approval by the Commonwealth of Massachusetts of the named organization.

Name of organization:               MATTAPAN COMMUNITY CENTERS, INC.

Certificate End Date:               11/15/2018

Attorney General's Account Number: 035182

Issued By
The Division of Non-Profit Organizations/Public Charities



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

**MAURA HEALEY**
**ATTORNEY GENERAL**

MATTAPAN COMMUNITY CENTERS, INC.
c/o C. Cope
5 Mildred Avenue
Mattapan, MA 02126-

## Certificate for Solicitation

This certificate has been issued to the organization listed below because it is current in its filings with the Attorney General's Division of Non-Profit Organizations/Public Charities. This registration in no manner constitutes endorsement or approval by the Commonwealth of Massachusetts of the named organization.

Name of organization:          MATTAPAN COMMUNITY CENTERS, INC.

Certificate End Date:          11/15/2017

Attorney General's Account Number: 035182

Issued By
The Division of Non-Profit Organizations/Public Charities

USMS
SCREENED