UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILLIAM VEAL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| COMMISSIONER OF BOSTON CENTERS | * | Civil Action No. 21-cv-10265-ADB |
| FOR YOUTH & FAMILIES, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff William Veal ("Plaintiff") alleges that the City of Boston ("City"), former City Mayor Martin Walsh ("Walsh"), Boston Centers for Youth and Families ("BCYF"), BCYF Commissioner William Morales ("Morales"), former Deputy BCYF Commissioner Michael Sulprizio ("Sulprizio"), City Operations Manager Lorna Bognanno ("Bognanno" and together with the City, Walsh, BCYF, Morales, and Sulprizio, the "City Defendants"), Plaintiff's former accountant, Thomas Bowe ("Bowe"), Bowe's accounting firm, Thomas Bowe CPA ("Bowe CPA"), and Plaintiff's former employee, Bonnie Wallace ("Wallace"), violated several state and federal laws in connection with a lease agreement that allowed Plaintiff to operate a community center. Currently pending before the Court are three motions to dismiss the amended complaint. [ECF Nos. 27 (Bowe and Bowe CPA), 29, (Wallace), 31 (City Defendants)]. For the reasons set forth below, the motions are <u>GRANTED</u>. Plaintiff's federal law claims are dismissed with prejudice and the remaining state law claims are dismissed without prejudice.

# I.     BACKGROUND

## A.     Factual Background

The following facts are drawn from the amended complaint, the allegations of which are taken as true for purposes of evaluating the motions to dismiss.  See Ruivo v. Wells Fargo Bank, 766 F.3d 87, 90 (1st Cir. 2014).

### 1.     The Agreement

Plaintiff's allegations center around an oral agreement that permitted him to operate a neighborhood community center, Mattapan Community Centers, Inc ("Mattapan").  [ECF No. 26 ("Am. Compl.")].  In 2003, Plaintiff, Mattapan, and Bognanno, who was acting on behalf of the City and BCYF, entered into an oral contract where the City would lease Plaintiff a building for $0 and Plaintiff would use the building to run a community center (the "Agreement").  [Id. ¶¶ 28, 35, 37].  The Agreement was set to expire in 2023.  [Id. ¶¶ 34–35].  Plaintiff alleges that Bognanno represented that she had the authority to enter into the Agreement on behalf of the City and BCYF.  [Id. ¶ 37].

 Under the Agreement, Plaintiff and Mattapan would manage the building and hire the program's employees.  [Am. Compl. ¶ 29].  The City would be responsible for utilities, maintenance, and repairs for the building.  [Id. ¶ 30].  The City would not receive any commission from the revenue generated by Mattapan and Plaintiff would not take any salary for his work until Mattapan was "financially sound."  [Id. ¶¶ 29, 30, 32].  Plaintiff would also run all of Mattapan's programs, manage payroll, maintain bookkeeping, and obtain liability and other insurance.  [Id. ¶¶ 31–33].  Before terminating the Agreement in 2023, BCYF and the City were supposed to hold a meeting to determine if there was just cause for ending the lease.  [Id. ¶ 34].  The Agreement was honored for over a decade, during which time Plaintiff instituted several

successful programs, including day care, afterschool care, summer camp programs, and basketball leagues.  [Id. ¶ 20].

In 2014, Walsh was elected the City's Mayor.  [Am. Compl. ¶ 42].  At that time, Plaintiff asked Bognanno if the Agreement could be put in writing because he was concerned that Walsh would not be aware of an oral contract put in place under the previous administration.  [Id. ¶ 43]. Bognanno said that there was no need to put the Agreement in writing.  [Id.].  In 2015, when Sulprizio was appointed as Deputy Commissioner of BCYF, Plaintiff again asked Bognanno to put the Agreement in writing and she again said it was not necessary.  [Id. ¶¶ 44, 45].  Then, in 2016, Morales was appointed BCYF Commissioner.  [Id. ¶ 46].

2.    The New Community Center Agreements

In 2016, Bognanno and Morales, under orders from the City, Walsh, and Sulprizio, held a meeting with Plaintiff and other community center leaders.  [Am. Compl. ¶ 49].  At this meeting, Morales and Bognanno announced a plan to bring all community centers "under one umbrella" where all funds would be held in one account and the City and BCYF would implement contract changes.  [Id. ¶ 53].  Under the plan, the community center contracts already in place would not be renegotiated, but other "serious changes" would be made to them.  [Id. ¶¶ 53, 60].  Upon hearing this plan, Plaintiff protested the proposed changes and referenced his Agreement, which was in place until 2023.  [Id. ¶ 54].  Bognanno and Morales allegedly agreed that the Agreement should be honored, and Plaintiff relied on this representation.  [Id. ¶¶ 54–55].  At this meeting, Plaintiff also revealed that he would begin taking a salary in January 2018 because Mattapan was finally financially sound and "generating great profits."  [Id. ¶¶ 56–57].

Under the new plan, several specific changes regarding the City's community centers would be implemented including that (1) Mattapan and all other community centers would need

to perform background checks on employees and pay for an annual audit to be performed by the City and Sulprizio, [Am. Compl. ¶¶ 61, 62]; (2) Plaintiff and Mattapan would have to pay for some utilities, repairs, and maintenance, [id. ¶ 63]; (3) Plaintiff would also have to take out a one-million-dollar insurance policy for liability, property damage, and workers' compensation, which also needed to cover the City and BCYF, [id.¶ 64]; and (4) BCYF would begin collecting money from the community center programs and rental fees for City buildings, [id. ¶ 67]. Ultimately, once these changes were implemented, the Agreement for a $0 lease would no longer be in effect. [Id. ¶ 68]. Plaintiff protested the termination of the Agreement and requested that the oral agreement be put in writing or that the City, BCYF, Bognanno and Morales negotiate a new contract in good faith. [Id. ¶¶ 68–69]. Plaintiff asserts that after making this request Morales and Bognanno assured him that a written contract would be provided in the next few months, but it never arrived. [Id. ¶ 71]. Instead, a few weeks later, the City Defendants began directing their employees to withhold funds from Mattapan. [Id. ¶ 72].

        3.      <u>Involvement of Wallace, Bowe, and Bowe CPA</u>

Bowe and his company, Bowe CPA, served as the accountant for Mattapan. <u>See</u> [id. ¶ 74]. During a heavy snowfall in 2015, the roof of a commercial property owned by Plaintiff's sister collapsed. [Id. ¶¶ 75–77]. Plaintiff approached Bowe to tell him that in October 2015 the Mattapan Board had voted to give Plaintiff's sister a "first mortgage." [Id. ¶ 78]. Plaintiff asked Bowe if this was legal, and Bowe advised him that the Board should do another vote without Plaintiff present. [Id. ¶ 79]. The Board, without Plaintiff, again voted to grant the first mortgage as a fundraising mechanism for Mattapan. [Id. ¶ 80]. The mortgage was never executed or recorded. [Id. ¶ 81]. At the time of the Board vote, Wallace was the bookkeeper for Mattapan. <u>See</u> [id. ¶¶ 9, 82–83].

At some point, Bognanno, Sulprizio, and Morales contacted Bowe and Wallace to tell them that they were looking for a way to terminate the Agreement and asked if they had any information that would be useful for that purpose.  [Am. Compl. ¶ 82].  In response to that request, Bowe and Wallace told Morales, Bognanno, and Sulprizio about the mortgage for Plaintiff's sister.  [Id. ¶ 83].  The City, Morales, Bognanno, and Sulprizio then relied on that information to terminate the Agreement.  [Id.].  Plaintiff asserts that Bowe was promised contracts with other BCYF community centers if he provided information that could be used to terminate the Agreement.  [Id. ¶¶ 84–85].  The City Defendants similarly promised Wallace that she could keep working with the City and BCYF after the Agreement was terminated.  [Id. ¶ 85].  Bognanno, Sulprizio, and Morales, at the direction of the City and Walsh, then told Bowe and Wallace to distance themselves from Plaintiff due to his involvement in illegal behavior (*i.e.*, authorizing the mortgage for his sister).  [Id. ¶ 87].  Bowe and Bowe CPA sent their official resignation letter to Plaintiff on February 20, 2017, which stated that the resignation was "[d]ue to . . . unethical decisions made by the [B]oard."  [Id. ¶¶ 88–89].

In a letter dated February 23, 2017, the City Defendants terminated their relationship with Plaintiff and Mattapan, which ended Plaintiff's $0 lease.  [Am. Compl. ¶ 91; ECF No. 26-1 at 9–10].  The letter stated that "BCYF made this decision after it was brought to [its] attention that [Plaintiff's] non-profit organization voted to authorize a loan to a relative. . . . By authorizing a loan to [a] relative, it appears that [Plaintiff's] organization failed to meet [its] primary legal responsibilities."  [ECF No. 26-1 at 9].

The letter was not sent directly to Plaintiff or Mattapan but was instead sent to his sister's commercial property.  [Am. Compl. ¶ 93].  Plaintiff eventually received the letter from a coworker who said "it was floating around" Mattapan.  [Id. ¶ 118].  At some point, Morales also

falsely told Plaintiff that he and Mattapan were under investigation for criminal conduct by the

Attorney General's Office and that Morales needed to "cut all ties" with Plaintiff until the

investigation was complete.  [Id. ¶¶ 98–100].  Morales, Bognanno, Sulprizio, Wallace, and

Bowes also told Plaintiff's ex-employees and Mattapan's members that they could be sued if

Plaintiff was allowed on the Mattapan premises or if they did business with him.  [Id. ¶ 115].

**B.    Procedural History**

On April 23, 2021, Plaintiff filed his amended complaint, which asserts eight state and

federal claims: (1) breach of contract against Defendants, (Count 1), [Am. Compl. ¶¶ 140–51];

(2) breach of the implied covenant of good faith and fair dealing against Defendants (Count 2),

[id. ¶¶ 152–62]; (3) violation of 42 U.S.C. § 1981 against all defendants other than the City,

(Count 3), [id. ¶¶ 163–74]; (4) violation of the First and Fourteenth Amendments under 42

U.S.C. § 1983 against Defendants (Count 4), [id. ¶¶ 175–87]; (5) violation of Massachusetts

General Laws ch. 93A ("Chapter 93A") against Defendants (Count 5), [id. ¶¶ 188–99]; (6) unjust

enrichment against the City Defendants (Count 6), [id. ¶¶ 200–05]; (7) conspiracy in violation of

42 U.S.C. § 1985 against Defendants (Count 7), [id. ¶¶ 206–12]; (8) "retaliatory conspiracy" in

violation of 42 U.S.C. § 1985(2) against Defendants (Count 8), [id. ¶¶ 213–18].[1]

On May 7, 2021, the City Defendants, Bowe and Bowe CPA, and Wallace filed their

motions to dismiss the amended complaint in its entirety.  [ECF Nos. 27 (Bowe and Bowe CPA),

29 (Wallace), 31 (City Defendants)].  Plaintiff opposed the City Defendants' motion on June 21,

---

[1] Plaintiff also alleges another count for "injunctive relief" that appears to argue that he is
entitled to a preliminary injunction against the City and BCYF.  [Am. Compl. ¶¶ 219–20].  Other
than his conclusory allegations and recital of the legal standard for preliminary injunctive relief,
Plaintiff does not otherwise support his request and it is therefore DENIED.

2021, [ECF No. 40], and opposed Wallace, Bowe, and Bowe CPA's motions on June 23, 2021, [ECF No. 42].

## II.        LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a

'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting

Morales-Cruz, 676 F.3d at 224).

In this case, the Court construes the amended complaint liberally because it was filed *pro

se*. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). "However, pro se status does not insulate a

party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d

886, 890 (1st Cir. 1997). Dismissal of a *pro se* complaint is appropriate when the complaint fails

to state an actionable claim. Muller v. Bedford VA Admin. Hosp., No. 11-cv-10510, 2013 WL

702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303

(D. Mass. 2001)).

## III.      DISCUSSION

### A.      Federal Law Claims

#### 1.      Count 3: Violation of 42 U.S.C. § 1981

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the

United States shall have the same right . . . to make and enforce contracts . . . and to the full and

equal benefit of all laws and proceedings . . . as is enjoyed by white citizens . . . ." 42 U.S.C.

§ 1981(a). As the First Circuit recently reiterated,

> [t]he "exclusive federal remedy for violation of the rights guaranteed in § 1981 by
> state governmental units" is section 1983. Buntin v. City of Boston, 857 F.3d 69,
> 70-71 (1st Cir. 2017) (quoting Jett v. Dallas ISD, 491 U.S. 701, 733 (1989)). Thus,
> a plaintiff "may not bring claims for damages under 42 U.S.C. § 1981 against state
> actors." Id. at 70.

Alston v. Town of Brookline, 997 F.3d 23, 42 (1st Cir. 2021); see also Brooks v. Martha's

Vineyard Transit Auth., 433 F. Supp. 3d 65, 75 (D. Mass. 2020) (granting a municipal transit

authority's "motion for summary judgment because under binding precedent 42 U.S.C. § 1981

does not provide a cause of action against state actors"). Accordingly, given this clear precedent,

Plaintiff's claim under § 1981 cannot be brought against the City Defendants.  See Alston, 997 F.3d at 42 (holding that individual government employees, just like the municipality itself, could not be held liable in their individual or official capacities because "those defendants are also state actors and they are alleged to have acted only within the realm of their official duties.").

Independent of the First Circuit's holding in Alston, Plaintiff's § 1981 claim must be dismissed as to all Defendants because he has not alleged facts to support the plausible inference that, *but for* his race, the Agreement would not have been terminated.  The Supreme Court held that a § 1981 claim requires "a plaintiff [to] initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."  Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).  Other than alleging that he is a racial minority, [Am. Compl. ¶ 1], and asserting in a conclusory manner that "[b]ut for race [P]laintiff would not have suffered the loss of a legally protected right" there is nothing in the amended complaint that plausibly alleges that race was the but for (or any) reason behind the Agreement's termination or any Defendant's conduct,[2]  [Am. Compl. ¶ 165].

Plaintiff also appears to allege that the Agreement's termination was retaliatory and in violation of § 1981.  While § 1981 does encompass retaliation claims, "[b]ecause § 1981 is concerned only with discrimination on the basis of race, its implicit prohibition of retaliation against those who complain of discrimination is similarly limited to complaints of *racial* discrimination," Long v. Marubeni Am. Corp., 406 F. Supp. 2d 285, 290 (S.D.N.Y. 2005); see also Fantini v. Salem State Coll., 557 F.3d 22, 33 (1st Cir. 2009) (affirming dismissal of a § 1981

---

[2] The amended complaint includes other statements regarding race and racial discrimination, but they are likewise conclusory or simply recite legal principles rather than alleging facts that could support the plausible inference that racial discrimination was a reason for any Defendant's actions.  E.g., [Am. Compl. ¶¶ 107, 112, 114, 136, 138, 210].

claim and rejecting argument that "race is no longer required to make out a claim under

§ 1981"); Cabi v. Bos. Children's Hosp., 161 F. Supp. 3d 136, 157 (D. Mass. 2016) ("42 U.S.C.

§ 1981 'prohibits not only racial discrimination but also retaliation against those who oppose it.'"

(quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 355 (2013))).  Because the

amended complaint lacks any factual allegations to support the plausible inference of racial

discrimination or that Plaintiff complained of any racial discrimination, a retaliation claim under

§ 1981 also fails.

 Accordingly, Count 3 is DISMISSED.

 2. Count 4: Violation of 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a cause of action for anyone who has a constitutional right

violated by a person acting "under color of any statute, ordinance, regulation, custom, or usage,

of any State."  Plaintiff alleges that he was deprived of his property interest in the Agreement and

his liberty interest in his reputation without due process.  [Am. Compl. ¶¶ 180, 182].  He also

claims that the Agreement was terminated in retaliation for exercising his civil rights.  [Id.

¶ 187].

 a. Non-State Actors

The § 1983 claims against Wallace, Bowe, and Bowe CPA must be dismissed because

Plaintiff explicitly alleges that these three defendants did not act under color of state law, [Am.

Compl. at 1], and thus, he cannot maintain a cause of action against them under § 1983, see 42

U.S.C. § 1983; Destek Grp., Inc. v. State of New Hampshire Pub. Utilities Comm'n, 318 F.3d

32, 39 (1st Cir. 2003).

b.      Statute of Limitations

Wallace asserts that the statute of limitations bars Plaintiff's § 1983 claims because he did not file his complaint until February 16, 2021, [ECF No. 1], which was almost four years after the City Defendants sent notification of the Agreement's termination.  [ECF No. 30 at 9–10].

The Court agrees that § 1983 claims based on a property interest created by the Agreement or a retaliatory breach of the Agreement are time barred.  In actions brought under 42 U.S.C. § 1983, "courts use the personal-injury limitations period adopted by the state where the injury supposedly occurred" as the statute of limitations.  Martinez-Rivera v. Puerto Rico, 812 F.3d 69, 74 (1st Cir. 2016); see also Wilson v. Garcia, 471 U.S. 261, 280 (1985) (holding "§ 1983 claims are best characterized as personal injury actions" and finding the court of appeals correctly applied the state statute of limitations on personal injury claims), superseded by statute on other grounds as stated in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004).  To determine when the limitations period begins, courts look to federal law, which provides that "accrual commences when a plaintiff knows, or has reason to know, of the discriminatory act that underpins his cause of action."  Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748–49 (1st Cir. 1994).

Here, the injuries that form the basis for Plaintiff's § 1983 claim occurred in Massachusetts, when the Agreement was terminated by the City Defendants via letter on February 23, 2017.  [Am. Compl. ¶ 91; ECF No. 26-1 at 9].  Plaintiff alleges that he received notice of the Agreement's termination on or around March 25, 2017.  [Am. Compl. ¶ 117].  Because the statute of limitations on personal injury actions under Massachusetts law is three years, Mass. Gen. Laws ch. 260, § 2A, the statute of limitations on Plaintiff's § 1983 claim is

also three years, see Martinez-Rivera, 812 F.3d at 74–75; Connell v. Bd. of Selectmen of Town

of Harwich, 215 F.3d 1311 (1st Cir. 2000) (unpublished table decision).  The limitations period

therefore began to run on or around March 25, 2017.  See Del. State Coll. v. Ricks, 449 U.S. 250,

258 (1980) (holding the limitations period begins to run at the time the "discriminatory act"

occurs, not when "the consequences of the act [become] most painful" (quoting Abramson v.

Univ. of Haw., 594 F.2d 202, 209 (9th Cir. 1979))); Connell, 215 F.3d 1311 ("A cause of action

under 42 U.S.C. § 1983 accrues when a plaintiff knew, or should have known, of the wrongful

act or acts alleged in the complaint.").  Taking into account the Massachusetts Supreme Judicial

Court's ("SJC") June 24, 2020 Order, which tolled statutes of limitations from March 17, 2020

until June 30, 2020 due to the COVID-19 pandemic, the time for filing the instant action expired,

at the latest, on July 10, 2020.[3]  Plaintiff counters that a six-year statute of limitations should

---

[3] The SJC's order states, in relevant part, that

> All civil statutes of limitations were tolled by Prior SJC Orders from March 17,
> 2020, through June 30, 2020, and will not be tolled any further unless there is a new
> surge in COVID-19 cases in the Commonwealth and the SJC determines that a new
> or extended period of tolling is needed. All criminal statutes of limitation are tolled
> from March 17, 2020, through September 30, 2020, because of the limited
> availability of grand juries. The new date for the expiration of a statute of limitation
> is calculated as follows: determine how many days remained as of March 17, 2020,
> until the statute of limitation would have expired, and that same number of days
> will remain as of July 1, 2020 in civil cases and as of September 30, 2020 in
> criminal cases. For example, if fourteen (14) days remained as of March 17 before
> the statute of limitation would have expired in a civil case, then fourteen (14) days
> will continue to remain as of July 1, before the statute of limitation expires (i.e.,
> July 15), and if fourteen (14) days remained as of March 17 before the statute of
> limitation would have expired in a criminal case, then fourteen (14) days will
> continue to remain as of September 30, before the statute of limitation expires (i.e.,
> October 14).

Third Updated Order Regarding Court Operations Under the Exigent Circumstances Created by
the COVID-19 (Coronavirus) Pandemic, Massachusetts Supreme Judicial Court (June 24, 2020),
https://www.mass.gov/doc/sjc-third-updated-order-regarding-court-operations-under-the-

apply because his claim is a contract claim, not a personal injury claim.  See [ECF No. 42 ¶¶ 32–33].  This argument ignores that Count 4 is a § 1983 claim and not a breach of contract claim, and that "courts use the personal-injury limitations period adopted by the state where the injury supposedly occurred" as the statute of limitations for § 1983 claims.  Martinez-Rivera, 812 F.3d at 74.[4]

        c.      Liberty Interest in Reputation

Plaintiff asserts a due process violation based on reputational harm caused by the City Defendants.  [Am. Compl. ¶ 177 ("Plaintiff had a Property Interest in his continued Employment and had a Liberty Interest in his Reputation. . .")].  It is unclear when that conduct began or if it continues, thus the Court cannot rule at this point that it is barred by the statute of limitations.  Regardless, Plaintiff still cannot maintain a § 1983 claim based on his reputational harm because he has not plausibly alleged facts sufficient to satisfy the First Circuit's "stigma plus" standard.  As the First Circuit explained,

> [a] due process claim cannot rest upon reputational harm alone. See Paul v. Davis, 424 U.S. 693, 701–02 (1976) (holding that mere defamation by a state actor does not violate constitutional rights); URI Student Senate v. Town of Narragansett, 631 F.3d 1, 10 (1st Cir.2011). "Thus, when a person alleges that []he has suffered stigmatization at the hands of a government actor, []he must show an adverse effect on some interest more tangible than reputational harm." URI, 631 F.3d at 9 (internal quotation marks omitted). That is, "the reputational injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law." Silva v. Worden, 130 F.3d 26, 32 (1st Cir.1997); see also URI, 631 F.3d at 10. "To use the popular catch phrase, the complaining party must satisfy a 'stigma plus' standard." URI, 631 F.3d at 9.

---

exigent-circumstances-created-by/download; [Am. Compl. ¶ 126 (referencing SJC's Order that "tolled all statutes of limitations for 106 days from March 17, 2020 through June 30, 2020")].

[4] Plaintiff also appears to allege that the City Defendants' refusal to meet with him in January 2018 is also a violation of his due process rights, [Am. Compl. ¶ 102], but without any further factual allegations regarding this meeting request or how it is tied to any constitutionally protected interest, it alone is insufficient to state a claim under § 1983.

Mead v. Indep. Ass'n, 684 F.3d 226, 233 (1st Cir. 2012).  Construing the amended complaint liberally, the reputational harm appears to be related to Morales's false claim that the Attorney General was investigating Plaintiff, the City Defendants' suggestion that the Board's vote to grant a mortgage to Plaintiff's sister was criminal, and other "retaliatory conduct" that "encourage[ed] witness and other [employees] and contract holders with defendants not to cooperate with Plaintiff."  [Am. Compl. ¶¶ 99, 119, 121].  Plaintiff also alleges that the reputational harm has led to him not being able to get future employment.  [Am. Compl. ¶ 121].  Taking those statements as true and assuming that Plaintiff's reputation was damaged in some way, there are nonetheless insufficient facts to support the plausible inference that the reputational injury resulted in a change to Plaintiff's status or rights.  Notably, the First Circuit explicitly held that an allegation that a government agency's statement imposed "tangible burdens on [plaintiff's] future employment prospects" was not a "plus" factor, in part, because "the damage is solely the result of harm to [plaintiff's] reputation, not some statutory impediment or other legal obstacle to her employment."  Mead, 684 F.3d at 235.  And although the Agreement's termination, which accompanied the City Defendants' statements regarding the illegality of the Board's vote, could possibly be considered a change in status or rights that satisfies the "stigma plus" standard, as described above, claims premised on the termination of the Agreement are barred by the statute of limitations.  Therefore, Plaintiff has failed to state a due process claim based on reputational injury.

      Accordingly, Count 4 is DISMISSED.[5]

---

[5] To the extent Plaintiff bases his § 1983 claim on retaliation for speaking out against racial discrimination, [Am. Compl. ¶ 121], it is unable to survive a motion to dismiss given his failure to assert any non-conclusory allegations regarding racial discrimination.

3.      Counts 7 and 8: Conspiracy under 42 U.S.C. § 1985

In Count 7, Plaintiff appears to allege that Defendants conspired to deprive him of equal

protection under the laws due to his race in violation of § 1985(3).[6]  [Am. Compl. ¶¶ 210–11].

> Section 1985 provides a remedy for acts of civil conspiracy in which two or more
> individuals conspire for the purpose of depriving another of rights or privileges
> accorded to them by law. See 42 U.S.C. § 1985(3). To plead an actionable claim
> under this statute, [plaintiff] must allege the existence of a conspiracy, allege that
> the purpose of the conspiracy is to deprive the plaintiff of the equal protection of
> the laws, describe at least one overt act in furtherance of the conspiracy, and show
> either injury to person or property, or a deprivation of a constitutionally protected
> right.

Alston v. Spiegel, 988 F.3d 564, 577 (1st Cir. 2021) (internal quotation marks omitted).  "[T]he

agreement [under § 1985(3)] must involve 'some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action.'"  Parker v. Landry, 935 F.3d

9, 18 (1st Cir. 2019).

In Count 8, though it is not entirely clear, Plaintiff appears to bring a claim under

§ 1985(2) based on his assertion that Defendants conspired to retaliate against him because he

was asserting his rights.  [Am. Compl. ¶¶ 214–15, 218].

> The second clause of § 1985(2) . . . prohibits conspiracies to obstruct "the due
> course of justice in any State or Territory, with intent to deny to any citizen the
> equal protection of the laws, or to injure him or his property for lawfully enforcing,
> or attempting to enforce, the right of any person, or class of persons, to the equal
> protection of the laws."

Knowlton v. Shaw, 704 F.3d 1, 11–12 (1st Cir. 2013).  Like a § 1985(3) claim,

> [b]ecause that language is "directed toward 'the equal protection of the laws,'" a
> plaintiff must allege a "class-based, invidiously discriminatory animus" to state a
> plausible § 1985(2) claim.  Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975)

---

[6] Although Plaintiff only generally alleges Count 7 under 42 U.S.C. § 1985 and does not specify
which of the statute's three subsections he is relying on, the Court analyzes it as a claim under
§ 1985(3) because Count 8 brings a claim under 42 U.S.C. § 1985(2) and 42 U.S.C. § 1985(1)
involves conspiracies to prevent federal officers from performing duties which does not seem
applicable.

(quoting <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (1971)); <u>Schneider v. Tretola</u>, 8 F.3d 809 (1st Cir. 1993) (per curiam) (unpublished).

<u>Id.</u>

Even assuming Plaintiff had alleged enough facts to support the inference of a conspiracy, the amended complaint contains no non-conclusory allegations that would allow for the plausible inference that Defendants' conduct was motivated by Plaintiff's race, discriminatory animus, or another protected characteristic.  <u>See, e.g.</u>, [Am. Compl. ¶ 112 ("All Defendants launched an intentional Race Discriminatory Retaliatory campaign against the Plaintiff for advocating on behalf of myself, Mattapan, and the public for equal agreement/contract, Constitution rights and due process."); ¶ 210 ("There was conspiracy among all defendants, based on my race and racial animus laid behind all the defendant's action, the conspiracy was aimed at interfering with my protected rights.")].  Therefore, because he has failed to allege this element of a § 1985 claim, Counts 7 and 8 are <u>DISMISSED</u>.

**B.      State Law Claims**

Because the Court has dismissed all of Plaintiff's federal claims, and there is no basis for diversity jurisdiction, the Court must determine whether it should exercise supplemental jurisdiction over the remaining state law claims.  <u>See</u> [Am. Compl. ¶¶ 1–10, 12 (alleging that Plaintiff and all individual defendants are residents of Massachusetts and that the basis for jurisdiction is 28 U.S.C. § 1331)].

Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under [the supplemental jurisdiction statute] if— . . . (3) the district court has dismissed all claims over which it has original jurisdiction." "In determining whether to retain jurisdiction on such an occasion, the court must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  <u>Delgado v. Pawtucket</u>

Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012).  The decision "is a 'pragmatic and case-specific' one," id. (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996)), but "[t]he Supreme Court has made pellucid 'that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors. . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Rivera-Diaz v. Humana Ins. of Puerto Rico, Inc., 748 F.3d 387, 392 (1st Cir. 2014) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

Here, the case is still in the early stages of litigation. The complaint has been amended, but there has been no discovery.  Ultimately, the remaining state law claims, which may have merit, are more appropriately brought in state court because they turn on questions of state law and comity concerns weigh in favor of allowing state courts to interpret these questions.  In particular, the Chapter 93A claim involves the issue of a municipality's liability and the meaning of "trade or commerce" under the statute.  [ECF No. 35 at 16–20].  The breach of contract claim requires interpreting provisions of the Boston City Charter and state procurement law.  [Id. at 7–9].  "[I]t can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts."  Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017).  Thus, the Court declines to exercise supplemental jurisdiction and dismisses the remaining state law claims without prejudice to Plaintiff bringing the claims in state court.

## IV.     CONCLUSION

Accordingly, for the reasons set forth above, the Defendants' motions to dismiss, [ECF Nos. 27, 29, 31], are GRANTED.  Counts 3, 4, 7, and 8 are DISMISSED with prejudice.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims and

therefore Counts 1, 2, 5, and 6 are <u>DISMISSED</u> without prejudice.  To the extent Plaintiff seeks a preliminary injunction, that request is <u>DENIED</u>.

        **SO ORDERED.**

March 10, 2022

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE
